LEVI W. HEATH (SBN 220854)
levi.heath@btlaw.com
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California  90067
Telephone:   (310) 284-3880
Facsimile:    (310) 284-3894

CHAD S.C. STOVER, *pro hac vice*
chad.stover@btlaw.com
**BARNES & THORNBURG LLP**
1000 N. West Street, Suite 1500
Wilmington, Delaware  19801
Telephone: (302) 300-3434
Facsimile: (302) 300-3456

*Attorneys for Defendant*
*Verbatim Americas LLC*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| e.Digital Corporation,<br><br>                Plaintiff,<br><br>     v.<br><br>Verbatim Americas LLC,<br><br>                Defendant. | Case No.  3:13-cv-02943-H-BGS<br><br>**DEFENDANT VERBATIM AMERICAS LLC'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Date:        January 9, 2015<br>Time:       9:00 a.m.<br>Courtroom:  15A (Annex)<br>Judge:     Hon. Marilyn L. Huff |

1

**Table of Contents**

2

Introduction ................................................................................................ 1

3

Applicable Law ........................................................................................... 2

4

Argument ..................................................................................................... 5

5

I.      Level of Ordinary Skill in the Art ..................................................... 5

6

II.     The '108 Patent's Disclosure ........................................................... 5

7

          A.     The '108 patent provides no description of claim 1's

8

                     subject matter; the only support for claim 1 is in the '445
patent's disclosure. ...................................................... 5

9

          B.     The '108 patent does not properly incorporate by
reference the '445 patent's disclosure. ........................ 5

10

          C.     Claim 1 is indefinite without the benefit of the '445

11

                     patent's specification. ................................................... 7

12

          D.     In any event, the disclaimers in the '445 patent file history
apply to the '108 patent. ............................................. 8

13

III.    Proposed Constructions for Disputed Terms ................................. 10

14

          A.     The Preamble Is Limiting. ......................................... 10

15

          B.     Disputed Terms from the Preamble ........................... 12

16

          C.     Terms from Step (a) of Claim 1: Creating the Primary
Memory .................................................................. 17

17

          D.     Terms from Step (b) of Claim 1: Coupling the Cache

18

                     Memory to the Primary Memory ............................... 18

19

          E.     Terms from Step (c) of Claim 1: Linking a New Data
Segment to a Previous Data Segment ........................ 20

20

V.     Conclusion .................................................................................... 25

21

22

23

24

25

26

27

28

1

## Table of Authorities

2

**Cases**

*Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214 (Fed. Cir. 1997) ................4

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001)...................................................................2

*Amhil Enters. Ltd. v. Wawa, Inc.*,
81 F.3d 1554 (Fed. Cir. 1996)....................................................................2

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090 (Fed. Cir. 2013)..........16

*Brookhill-Wilk 1 v. Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003) ...........4

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801 (Fed. Cir.
2002)...............................................................................................10, 11, 12

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361
(Fed. Cir. 2012) ...........................................................................4, 17, 20

*Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328 (Fed. Cir. 2000).....................4

*e.Digital v. Pentax of Am.*, 9-cv-2578, ECF No. 395, Markman Order (D.
Colo. Jun. 28, 2011) ................................................................................13

*Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322 (Fed. Cir. 2009)..............19

*Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313 (Fed. Cir. 2007).......................8

*Harris Corp. v. IXYS Corp.*,
114 F.3d 1149 (Fed. Cir. 1997)...................................................................2

*Honeywell Int'l v. ITT Indus.*, 452 F.3d 1312 (Fed. Cir. 2006) ...........................3, 19

*Kumar v. Ovonic Battery Co.*, 351 F.3d 1364 (Fed. Cir. 2003) ..............................19

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ...................2

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004).................................................................1

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014)........................7, 8

*O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576 (Fed. Cir. 1997).....................................4

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003)..........................8

*On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331 (Fed. Cir. 2006)..........................................................................................................12

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)..................................3, 4, 18

*Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306 Fed. Cir. 2008)......................................7

*Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243 (Fed. Cir. 1998)..........................................................................................................2, 18

*Rotatable Techs. LLC v. Motorola Mobility LLC*, No. 2014-1042, 2014 WL 2898532 (Fed. Cir. June 27, 2014).................................................................11

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001).........................................................................................3

*Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372 (Fed. Cir. 1998)...........................4

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996).................3, 4

*Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370 (Fed. Cir. 2007)..................6

**Statutes**

35 U.S.C. § 112...........................................................................................7, 8, 10

13cv2943

72424638.1

**Introduction**

The patent-in-suit, U.S. Patent No. 5,839,108 ("'108 patent"), claims a specific memory management method for data stored in non-volatile memory, such as flash memory.  According to the patent, this method allows flash memory to act as the primary memory in a computer system.  As the patent readily admits, flash memory management techniques were well known prior to the filing of the '108 patent.  For example, the patent makes reference to "prior art methods of file management, designed specifically for use with flash memory such as the system taught in U.S. Pat. No. 5,404,485 issued to Ban."  To obtain allowance of the '108 patent, the patentees distinguished their specific method of flash memory management from various prior-art methods.  In fact, the patentees made clear throughout the intrinsic record that the '108 patent does not broadly cover all methods of flash memory management, but is directed to the use of "linked lists" to manage memory rather than File Allocation Tables ("FATs").  FATs are also referred to as "memory maps."

Verbatim's constructions are grounded in the intrinsic evidence and reflect the inventors' actual alleged contribution.  In contrast, e.Digital's constructions ignore the words of the claims, the express disclosures in the specifications, and the patent's prosecution history and, instead, rely on extrinsic evidence in an effort to re-characterize the claimed inventions.  Verbatim's constructions, which stay true to the intrinsic record, should be adopted.

Central to the parties' claim construction dispute is whether the patent covers memory management using prior-art structures called FATs or memory maps.  The intrinsic record makes clear that the patentees disparaged this technique, described the technique as prior art, and distinguished their claims over references that utilize it.  Accordingly, consistent with the intrinsic record, Verbatim's constructions clarify that the claims do ***not*** cover FATs or memory maps.  *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) ("We cannot construe

72424638.1

the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO."). In contrast, e.Digital improperly seeks to have the patent cover the very memory management technique of using FATs that the patentees distinguished and disclaimed in the specification and during prosecution. e.Digital's cannot twist its patent, "like a nose of wax"—one way during prosecution to obtain allowance and another way during litigation to assert infringement. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). Indeed, it is a bedrock principle of patent law that a patent's claims cannot be construed to cover the prior art. *See Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1153 (Fed. Cir. 1997) (noting claims should be construed to avoid ensnaring prior art, and finding plaintiff's proposed construction, which captured prior art, was "much less plausible" than defendant's); *Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996) (claims should be construed to avoid prior art to preserve validity).

The remaining disputes present similar issues. Whereas Verbatim's constructions are grounded in the intrinsic record, e.Digital relies on less persuasive extrinsic evidence and ignores specific statements made by the patentees. For example, e.Digital's proposed construction for "data storage format," as "file system," replaces one claim term for another based solely on dictionary definitions. As another example, e.Digital's construction of "primary memory" would broadly capture any memory accessible by a computer processor, including "cache memory," a separate claim term. In each case, e.Digital improperly attempts to stretch the claim language to cover more than what was "actually invented." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir. 1998). e.Digital's proposed constructions, therefore, should be rejected.

## **Applicable Law**

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). A claim term

must be given the "ordinary and customary" meaning it would have had to a person of ordinary skill in the art at the time of the invention. *See Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

For some terms, the ordinary meaning may be readily apparent, such that construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In other circumstances, "[b]ecause the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* Such sources may include both intrinsic evidence (i.e., the claims, specification, and prosecution history) and extrinsic evidence. *See id.*; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996). However, "intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics*, 90 F.3d at 1582.

The claims do not stand alone, but must be read in view of the specification, of which they are a part. *Phillips*, 415 F.3d at 1315. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316. In some cases, the intrinsic evidence may reveal that the patentees acted as their own lexicographer and defined a claim term, in which case that definition governs. *See id.* Likewise, the patentee's use of the designation "this invention" or "the present invention" may guide how the claims are construed. *Honeywell Int'l v. ITT Indus.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).

The intrinsic evidence also may reveal a disclaimer or disavowal of scope, which is dispositive. *See Phillips*, 415 F.3d at 1316; *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature,

that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.").

Disclaimers in the specification are especially apparent when the patentees make repeated derogatory statements about a particular feature. *See Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012) ("[T]he specification goes well beyond expressing the patentee's preference . . . and its repeated derogatory statements about [a particular embodiment] reasonably may be viewed as a disavowal. . . .").

Arguments made during prosecution or reexamination to distinguish the invention from the prior art also serve as disclaimers. *See Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998) ("By distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover."); *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1220-21 (Fed. Cir. 1997) (same); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581 (Fed. Cir. 1997) (holding claimed "passages" were non-smooth where "the description expressly distinguishes over [smooth] prior art 'passages'"). A claim cannot be "correctly construed to cover what was expressly disclaimed." *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000).

Extrinsic evidence also may be considered, but although it "can shed useful light on the relevant art . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317. Dictionaries and technical treatises contemporaneous with the patent being construed may provide accepted meanings of terms. *See Phillips*, 415 F.3d at 1318; *Vitronics*, 90 F.3d at 1584 n.6; *Brookhill-Wilk 1 v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003) (admonishing district court for relying on non-contemporaneous references, and striking those references from consideration on appeal).

<u>**Argument**</u>

**I.   Level of Ordinary Skill in the Art**

The minimum qualifications for one of ordinary skill in the art of the '108 patent is someone who has a bachelor's degree or equivalent academic or professional training in computer engineering, electrical engineering, computer science or a closely related field, plus two to three years of work experience in design or development of memory devices and/or systems.

**II.   The '108 Patent's Disclosure**

> **A. The '108 patent provides no description of claim 1's subject matter; the only support for claim 1 is in the '445 patent's disclosure.**

Claim 1 of the '108 patent is an independent method claim relating to memory management for a file system with three main steps: (1) creating a primary memory, (2) coupling the primary memory to a cache memory, and (3) writing a new data segment from the cache memory to the primary memory by linking the new data segment to a sequentially previous logical data segment.

The steps of claim 1 are nowhere described in the '108 patent's disclosure. (*See* Ex. 1, '108 patent.)[1]  Instead, the only discussion of these steps appears in the '108 patent's parent:  the '445 patent.  (*See* Ex. 2, '445 patent at col. 4:19-39 (describing creating, coupling, and writing steps); *id.* Fig. 3A & col. 8:1-9 (describing arrangement of underlying hardware, including cache memory and primary memory); *id.* Fig. 7A & col. 16:8-17:61 (describing linkage of data segments using "logical links" in place of traditional tables or maps).)

> **B. The '108 patent does not properly incorporate by reference the '445 patent's disclosure.**

A patent must identify with "detailed particularity what specific material it incorporates and clearly indicate where the material is found in the various

---

[1] "Exs. 1-12" refer to exhibits appended to the concurrently filed Declaration of Chad S.C. Stover.

documents." *Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378-79 (Fed. Cir. 2007) (citation omitted).  Whether material has been incorporated by reference is a question of law.  *Id.*  "The standard of one reasonably skilled in the art should be used to determine whether the host document describes the material to be incorporated by reference with sufficient particularity.  *Id.*

The '108 patent fails to incorporate by reference the '445 patent's disclosure with sufficient particularity to one reasonably skilled in the art.  The patentees demonstrated they were capable of exercising the required level of care in drafting an incorporation by reference statement when incorporating by reference a different patent, U.S. Patent No. 5,491,774: "***The present invention hereinafter incorporates by reference the materials disclosed in U.S. Pat. No. 5,491,774.***" [2] (Ex. 1, '108 patent at 1:23-26.)  No such statement is present for the '445 patent.

This case is much like *Zenon*, in that the patentees "made clear what was being incorporated by reference and, ***by difference***, what was not." *Zenon*, 506 F.3d at 1382 n.3.  The patentees demonstrated they were capable of drafting a detailed and specific incorporation by reference statement, yet chose not to include one for the '445 patent.  In doing so, the patentees made clear that the '445 patent's disclosure was ***not*** incorporated by reference in the '108 patent.

Importantly, e.Digital may not rely on a claim for priority to the '445 patent as an incorporation by reference.  A claim for priority is simply a claim for the benefit of an earlier filing date for subject matter that is common to two or more applications by maintaining "continuity of disclosure [] throughout a chain of patents." *Id.* at 1378.  It does not serve to incorporate the content of the priority document in the application in which the claim for priority is made.  *Id.*  Here, there is no such continuity.  Indeed, the '108 patent is a continuation-***in-part***, which is an admission that the '108 and '445 patent disclosures are different in scope.

---

[2] All emphases are added unless otherwise noted.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C. Claim 1 is indefinite without the benefit of the '445 patent's specification.

"Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction."  *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008).  Indefiniteness, like claim construction, is a question of law.  *Id.*

The Patent Act requires that the specification of every patent "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112, ¶ 2.  The Supreme Court has stated that a patent's claims are indefinite when, viewed in light of the specification and prosecution history, they fail to "inform those skilled in the art about the scope of the invention with ***reasonable certainty***."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).

Here, without the benefit of the '445 patent's specification, claim 1 is indefinite because it fails to inform those skilled in the art about the scope of the following claim terms with reasonable certainty:  (1) "creating the primary memory from a non-volatile, long term storage medium, wherein the primary memory comprises a plurality of blocks in which the data segments are to be stored"; (2) "direct manipulation of contiguous and non-contiguous data segments"; (3) "file system"; (4) "cache memory"; (5) "a logical link between the previous logical data segment and the new data segment"; (6) "previous logical data segment"; and (7) "a path for sequentially accessing the data segments within the primary memory".

As discussed in section II.A, above, the steps of claim 1 are not described in the '108 patent.  Rather, these steps are only described in the '445 patent's specification.  One having ordinary skill in the art cannot determine what is and is not covered by the steps of claim 1 because the '445 patent's specification was not properly incorporated by reference.  As a result, claim 1 fails to "inform those

skilled in the art about the scope of the invention with reasonable certainty," and is therefore invalid.[3]  *Nautilus*, 134 S. Ct. at 2129.

### D. The disclaimers in the '445 patent file history apply to the '108 patent.

Because the '108 patent is a continuation-in-part of the '445 patent, the '445 patent file history serves as intrinsic evidence to construe the claims of the '108 patent, even though not incorporated by reference.  *See, e.g.*, *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003) ("[A]n interpretation asserted in the prosecution of a parent application can also affect continuation applications, continuation-in-part applications, and even related continuation-in-part applications arising from the same parent.").  The claim terms in question here are found in the claims of the '445 patent.  With the exception of one limitation, each and every element recited in claim 1 of the '108 patent is found in claim 1 of the '445 patent.

Moreover, the patentees never evinced a desire to recapture any claim scope disclaimed in the '445 patent.  *See, e.g., Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007) ("Although a disclaimer made during prosecution can be rescinded . . . the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited.").  Thus, the patentee's statements in the '445 patent's specification and prosecution history regarding claim scope carry forward to the '108 patent with equal force.  For instance, the '108 patent's specification endorses the disparagement of prior art found in the '445 patent's specification.  (*See* Ex. 1, '108 patent at 1:55-58; *see also id*. at 1:58-2:41 and Ex. 2, '445 patent at 2:41-3:21, wherein the '108 and '445 patent specifications identify, word-for-word, the same shortcomings in the prior art.)  Furthermore, the patentees made no statements to the examiner during prosecution stating that

---

[3] Failure to incorporate by reference the '445 patent also renders the claims invalid for failing the written description and enablement requirements of 35 U.S.C. § 112.  Verbatim intends to file a motion for summary judgment on these issues.

claim 1 at issue here should carry a broader, or otherwise different, scope than claim 1 of the '445 patent.  The '108 patent thus issued without an office action. The patentees should be held to such statements in construing the claim in question here, which includes each and every limitation from claim 1 of the '445 patent.

Notably, during prosecution of the '445 patent, the PTO rejected claim 1 of that patent as obvious in view of U.S. Patent No. 5,586,291 and J. Esakov & T. Weiss, *Data Structures – An Advanced Approach Using C* (1989).  (Ex. 3, '445 File History, July 1, 1997 Office Action at 3.)  The patentees traversed the rejection, arguing that the combination of cited references used a virtual memory map and thus taught away from the alleged invention.  (Ex. 4, '445 File History, November 10, 1997 Amendment.)  The patentees explained that the alleged invention obviated the need for a memory map and instead provided access to data through the use of a linked list file structure.  In particular, "[t]o increase efficiency, the **only way** [in the alleged invention] to determine the location of data is to traverse the linked list of data segments."  (*Id*. at 5.)  The patentees also distinguished the alleged invention from the cited prior art references and Ban because in the invention "data can be manipulated directly in flash memory."  (*Id*. at 8.)  The patentees further distinguished the linked list of the alleged invention, which is a "linked list for file structures," from prior art linked lists for "data structures."  (*Id*. ("Jeffrey teaches data structures.  In contrast, the present invention teaches an operating system using linked lists for file structures.") (emphasis in original).)  In other words, the patentees made clear their linked list is used in the specific context of a file system, and not for **any** data structure linkage.  In response to these arguments, the claim was allowed.  (Ex. 5, '445 File History, January 5, 1998 Notice of Allowability.)

1  **III.    Proposed Constructions for Disputed Terms[4]**

2        **A. The Preamble Is Limiting.**

| e.Digital's Proposed Construction | Verbatim's Proposed Construction |
|---|---|
| Preamble is not limiting | Preamble is limiting |

        The preamble of claim 1 of the '108 patent is limiting for a number of

reasons.  First, the patentees relied on terms in the preamble during prosecution to

distinguish the claimed invention from the prior art.  *Catalina Mktg. Int'l, Inc. v.*

*Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("[C]lear reliance on the

preamble during prosecution to distinguish the claimed invention from the prior art

transforms the preamble into a claim limitation . . . .").  During prosecution of the

'445 patent, the patentees relied on the terms "file system," "primary memory," and

the "direct manipulation . . . of data segments" from the preamble to distinguish

prior art references cited by the examiner.  The patentee first argued that the prior

art references were inapplicable because they were directed to "data structures" and

not specifically to "*file* structures":

> Jeffrey teaches <u>data structures</u>. In contrast, the present invention teaches
> an operating system using linked lists for <u>file structures</u>. The Office
> Action has seemingly failed to notice this distinction, and has failed to
> provide any motivation for treating file structures like data structures.

(Ex. 4, '445 File History, November 10, 1997 Amendment, at 8 (emphasis in

original).)  This distinction is captured by the preamble and particularly the

preamble term "file system"—indeed, the term "file" only appears in claim 1 as

part of the "file system" term.

        The patentee also argued that the prior art did not explain how to use flash

memory as primary memory, as does the invention of the '445 patent.  (Ex. 4, '445

_____

[4] The following sections assume that the '108 patent satisfies the definiteness
requirement of 35 U.S.C. § 112, despite not properly incorporating by reference
the '445 patent. Additionally, it is noted that, while selected citations from the
Intrinsic Support and Extrinsic Support from the Joint Claim Construction Chart
are cited herein, any other citations that are listed in the Joint Claim Construction
are expressly incorporated herein by reference.

File History, November 10, 1997 Amendment at 8 ("The combination of references falls far short of explaining how to deal with the difficulties of using flash memory as ***primary memory***.").)  Similarly, the patentee argued that "[u]nlike Ban, the present invention teaches how data can be ***manipulated directly*** in flash memory without significant RAM resources, and without having to use a FAT."  (*Id.*)  Thus, the patentees' arguments to overcome prior art demonstrate their "use of the preamble to define . . . the claimed invention" as a method applicable to only file systems where data can be manipulated directly in primary memory, transforming the preamble into a claim limitation.  *Catalina*, 289 F.3d at 808.[5]

Consistent with the file history, the '445 patent's specification makes clear that these aspects of the preamble differentiate the patent from the prior art:

> The present invention ***claims being able to manipulate data directly in flash memory because the flash file system of the present invention enables data to be read in a logical order regardless of how many segments the file is comprised of, and where these segments are saved in memory.***

(Ex. 2, '445 patent at 5:55-6:3; *see also id*. at 7:62-8:4; 4:53-55.)

Second, the patentees repeatedly stress the importance of a "file system" that allows direct manipulation of data in primary memory to their alleged invention, further confirming that the preamble is limiting.  *See Rotatable Techs. LLC v. Motorola Mobility LLC*, No. 2014-1042, 2014 WL 2898532, at *1 (Fed. Cir. June 27, 2014) ("The specification is replete with references to [preamble term] 'selectively rotating,' underscoring the importance of the feature to the claimed invention.").  For instance, the specifications of the '445 and '108 patents highlight

---

[5] In addition to relying on terms from the preamble to distinguish over prior art references during prosecution, the preamble forms the antecedent basis for the use of "primary memory" and "data segments" in the body of the claim.  *Catalina*, 289 F.3d at 808 ("[D]ependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention.").

the importance of the preamble by repeatedly characterizing it as central to the "object of the invention":

> Another object of the present invention *to provide a file system* for non-volatile, long-term storage media….

> Another object of this invention *to provide a file system* which has particular application to the storage medium of flash memory.

> Another object of the present invention *to provide a file system* which is significantly fault tolerant.

> The present invention also includes a method of memory management for a *primary memory* . . . *which enables direct manipulation of data segments stored therein*.

> These and other objects are realized in a method of memory management for a *primary memory* . . . *which enables direct manipulation of data segments therein*.

(Ex. 1, '108 patent at 3:34-4:9; *see also* Ex. 2, '445 patent at 3:33-59.)

In short, as repeatedly demonstrated during prosecution and in the '108 and '445 patent specifications, a "file system" that allows "direct manipulation" of data in "primary memory" "states the framework of the invention," *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006), and is thus limiting because it "give[s] life, meaning, and vitality" to the claims. *Catalina*, 289 F.3d at 808. Therefore, the Court should find the preamble of claim 1 limiting.

### B. Disputed Terms from the Preamble

#### 1. "primary memory"

| e.Digital's Proposed Construction | Verbatim's Proposed Construction |
|---|---|
| "addressable storage to which a computer system's microprocessor has direct access" | "main memory of a computer system, i.e., the main general-purpose storage to which the microprocessor has direct access" |

The parties propose similar constructions for the term "primary memory," with the principal dispute being whether the "primary" memory must be the "main" memory of the computer system. Both parties agree that primary memory is

12

13cv2943

memory for which a computer system's processor has direct access.  Consistent with the term's plain meaning and its use in the intrinsic record, Verbatim's construction further confirms that the primary memory is the main memory. Plaintiff would improperly expand the definition of primary memory, as Plaintiff must for infringement purposes, to *any* memory accessible by a computer's microprocessor.  This contradicts the intrinsic record, as well as the extrinsic evidence plaintiff repeatedly relies on to support its claim construction positions.

"Primary memory" appears throughout the elements of Claim 1.  It is defined in the specification and claims as being "created from non-volatile, long-term storage media."  (Ex. 1, '108 patent Claim 1, col. 4:5-8.)  An important goal of the '108 patent was to use non-volatile, long-term storage media as a replacement for RAM in a computer system.  The '445 and '108 specifications both state this objective.  (*See*, *e.g.*, Ex. 2, '445 patent at col. 2:5-7 ("Therefore, it would be advantageous to be able to replace RAM with a long-term storage medium."); Ex. 1, '108 patent col 2:34-38 ("While the objective of making a system see flash memory as RAM with its accompanying benefits of non-volatility is desirable, the approach taken by Ban fails to take full advantage of flash memory by continuing to rely heavily on RAM resources.").)

Both intrinsic and extrinsic evidence show that RAM, or primary memory, is synonymous with main memory.  The '108 patent incorporates by reference U.S. Patent No. 5,491,774 (the "'774 patent").  (*Id.* at col. 1:22-25 ("The present invention hereinafter incorporates by reference the materials disclosed in U.S. Pat. No. 5,491,774.").)  The disclosure of the '774 patent along with statements made during prosecution of that patent clearly show that it equates "main memory" and "RAM."  (*See* Ex. 6, *e.Digital v. Pentax of Am.*, 9-cv-2578, ECF No. 395, Markman Order at 13 (D. Colo. Jun. 28, 2011); Ex. 7, '774 File History, July 20, 1995, Resp. to Office Action, at 8, 11.)  Similarly, one of ordinary skill in the art in the mid-1990s would understand "main memory" to mean RAM.  (*See* Ex. 8, Microsoft

Press Computer Dictionary (2d ed. 1994) (defining "main memory" as "RAM" or "primary memory")).  As a result, the goal of the '108 patent is to use the claimed "primary memory" as the main memory of a computer system in order to abandon reliance on RAM.

That primary memory cannot be any addressable storage accessible by the computers' microprocessor (as proposed by plaintiff) is confirmed in the '445 patent's prosecution history.  In distinguishing the prior art, the patentees made clear that *cache* memory (which is not the main memory in the system, but nevertheless accessible by a computer microprocessor) is not primary memory:

> The combination of prior art references results in a non-volatile cache (**non-primary**) memory which has a virtual memory map describing linked lists.
> . . .
> Furthermore, Lasker only teaches using non-volatile memory as cache memory, **when cache memory does not have to deal with the substantially more difficult issues of primary memory** as explained in the present invention.

(Ex. 4, '445 File History, November 10, 1997 Amendment at 5, 7.)

But plaintiff's construction would improperly expand the definition of primary memory to capture a cache memory, which is directly contradicted by the intrinsic record.  Verbatim, therefore, respectfully requests that the Court reject e.Digital's construction and adopt Verbatim's interpretation of "primary memory."

**2. "file system"**

| e.Digital's Proposed Construction | Verbatim's Proposed Construction |
| --- | --- |
| plain and ordinary meaning | "system to organize and keep track of files without using file allocation tables (memory maps)" |

A "file system" is a term commonly used in the art and generally means a "system [] to organize and keep track of files."  (Ex. 9, Random House Personal Computer Dictionary (2d ed. 1996) (defining "file system" as a "system that an operating system or program uses to organize and keep track of files.")  But in the '108 and '445 patents, the patentees made clear they were disclosing a "file system"

14

13cv2943

that is different than the prior art by both defining it in the '445 patent's

specification and clarifying this definition in statements made during prosecution.

Consistent with Verbatim's proposed construction, the patentees

unambiguously made clear that the file system of the present invention does not use

memory maps or file allocation tables (FAT):

> It is yet another object to provide a file system which further reduces RAM requirements *by replacing a memory map with logically linked serial data segments*.
>
> . . .
>
> Still another object is to provide a *file system which uses absolute physical memory addresses to avoid the additional overhead created by memory mapping*.

(Ex. 2, '445 patent at 3:47-49, 3:57-59)

Indeed, to illustrate the benefits of avoiding memory maps, the '445 patent's

specification repeatedly disparages the teachings of the prior art reference U.S.

Patent No. 5,404,485 ("Ban"), which used memory maps:

> **The key feature to recognize is that Ban's method requires** *indirection through virtual mapping to compensate for the frequent movements of data.* The technique apparently enables flash memory to imitate the look of RAM, but at the crippling overhead cost of significant data movement when any modification is made.
>
> . . .
>
> The objectives of the Ban patent are highly desirable, but implementation *using the technique of virtual mapping leaves any system using the Ban method not only vulnerable to significant data loss*, but tied to a method which inherently cripples itself with overhead requirements.
>
> . . .
>
> The present invention takes a very different approach to memory management. . . . [It] overcomes the significant drawbacks of Ban.

(*Id.* at 7:20-25, 51-55, 62-65; *see also* Ex. 1, '108 patent at 1:55-2:32

(distinguishing Ban for the same reasons).)

Furthermore, during prosecution of the '445 patent, the patentees confirmed

to the Patent Office that their invention does not use a FAT (memory map):

> The present invention enables the ***elimination** of a **FAT** (**memory map**)* . . . [T]he only way to determine the location of data is to traverse the linked list of data segments.
>
> . . .
>
> The FAT as described in Jeffrey is the same FAT (or virtual memory map) described in Ban . . . ***which the present invention has taken great pains from which to distinguish itself***.
>
> . . .
>
> Unlike Ban, the present invention teaches how data can be manipulated directly . . . ***without having to use a FAT***.

(Ex. 4, '445 File History, November 10, 1997 Amendment at 5-6, 8.)  Because the patentees made clear that their "file system" does not use file allocation tables (memory maps), Verbatim's proposed construction of "file system," a "system to organize and keep track of files without using file allocation tables (memory maps)," should be adopted.  *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) ("[W]hen the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered.").

### 3. "direct manipulation of contiguous and non-contiguous discrete data segments"

| e.Digital's Proposed Construction | Verbatim's Proposed Construction |
| --- | --- |
| plain and ordinary meaning | "manipulation of contiguous and noncontiguous data segments directly in the primary memory through changes to data segment headers without using a file allocation table." |

The '445 patent specification makes clear that it is an object of the invention to provide manipulation of data segments directly in the primary memory:

> These and other objects are realized in a method of memory management for a primary memory . . . , ***which enables direct manipulation of data stored therein***.

(Ex. 2, '445 patent at 3:60-64; *see also* 5:65-6:3, 6:45-50, 7:6-25.)  Moreover, "[a]ll modifications take place ***as changes to data segment headers only***."  (*Id.* at

16

13cv2943

6:47-48.)  Thus, Verbatim's proposed construction should be adopted because it is consistent with the patentee's description of what direct manipulation is.

Additionally, as described in more detail above with respect to the term "file system," the patentees unambiguously made clear that the alleged invention does not use memory maps or file allocation tables (FAT) by disparaging the use of these technologies in the prior art.  These statements may reasonably be viewed as a disavowal of claim scope.  *See Chicago Bd. Options, LLC*, 677 F.3d at 1372.

### C. Terms from Step (a) of Claim 1: Creating the Primary Memory

**1. "creating the primary memory from a non-volatile, long term storage medium, wherein the primary memory comprises a plurality of blocks in which the data segments are to be stored" / "creating"**

| e.Digital's Proposed Construction | Verbatim's Proposed Construction |
|---|---|
| "causing a portion or portions of a non-volatile long term storage medium, comprised of a plurality of blocks in which the data segments are to be stored, to perform at least one of a host's primary memory functions" | "dividing the non-volatile, long-term memory into equal size blocks, each block being the smallest amount of data that can be read from or written to the memory in a single read or write operation" |
| "creating" – plain and ordinary meaning | "creating" means "making or producing" |

A disputed claim term cannot be viewed in a vacuum, but rather must be interpreted in the context of the entire patent, including the specification.  *Phillips*, 415 F.3d at 1313.  Here, the intrinsic record makes clear that creating the primary memory comprises "dividing the primary memory into equal size blocks, each block being the smallest amount of data which can be read from or written to memory in a single read or write operation."  (Ex. 2, '445 patent at 4:19-23.)  This forms the basis for Verbatim's proposed construction, with the only difference being that Verbatim proposes replacing "primary memory" with "non-volatile, long-term memory," because the claim itself states that primary memory is created from a "non-volatile, long-term storage medium."  (Ex. 1, '108 patent, Claim 1.)  Verbatim further clarifies that, consistent with how one of ordinary skill in the art

17

would understand the term, "creating" means "making or producing." (*See* Ex. 10, The Grosset Webster Dictionary (1970 ed.) (defining "create" as "to produce").)

e.Digital's proposed construction cannot be correct because it finds no basis in the claim language or in the specification. *Phillips*, 415 F.3d at 1314. e.Digital's proposed construction has nothing to do with creating a primary memory, but instead relates to causing portions of a memory to perform "a host's primary memory functions." Creating a memory and causing portions of that memory to perform functions are clearly two different steps. e.Digital seeks to redefine this limitation with phrases found nowhere in the specifications of the '445 or '108 patents. e.Digital's proposed construction thus runs afoul of the principle that claim construction must be grounded in evidence intrinsic to the patent in order to "stay true" to what the inventor actually invented. *Renishaw*, 158 F.3d at 1250.

For these reasons, Verbatim respectfully requests that the Court adopt its proposed construction of the "creating" limitation.

### D. Terms from Step (b) of Claim 1: Coupling the Cache Memory to the Primary Memory

#### 1. "coupling a cache memory to the primary memory, said cache memory providing temporary and volatile storage for at least one of the data segments"

| e.Digital's Proposed Construction | Verbatim's Proposed Construction |
|---|---|
| plain and ordinary meaning | "creating a removable, interchangeable electrical connection between the cache memory and the primary memory" |

The '108 patent discloses not just a coupling between the primary memory and the cache memory, but a specific coupling that is both removable and interchangeable. Repeatedly, the '108 patent explains that the flash memory used in the alleged invention is removable and interchangeable:

> These and other objects are realized in a CD quality record/playback device for use with a ***removable, interchangeable, flash memory recording medium*** which enables extended recording of 30 minutes or more.

(Ex. 1, '108 patent, 3:42-47 ; *see also id.* at 5:14-23; 8:44-51.)

13cv2943

Similarly, flash memory described in the '774 patent, which is incorporated by reference by the '108 patent,[6] and its prosecution history describe flash memory as removable and interchangeable:

> An electronic interconnect means 28 is electrically coupled to the memory circuitry 24 and is **configured for removable, electrical coupling with a flash memory module** 29 capable of retaining recorded digital information for storage in nonvolatile form.

(Ex. 11, '774 patent, 4:14-18; *see also id.* at 4:59-63.)

Because the patentee consistently described the flash memory as having a removable and interchangeable coupling in the abstract, specification, and claims, the term should be construed in light of these disclosures. *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1327-31 (Fed. Cir. 2009) (limiting the claim term "graft" to mean "intraluminal graft" when "the only devices" disclosed in the specification were intraluminal).

### 2.   "cache memory"

| e.Digital's Proposed Construction | Verbatim's Proposed Construction |
| --- | --- |
| plain and ordinary meaning | "memory strictly used to temporarily store a block of read/write data" |

Verbatim's proposed construction comports with the '445 patent's specification, which states that "**this invention** strictly uses a cache memory . . . to temporarily store a block of read/write data." (Ex. 2, '445 patent at 8:25-26.)  *See Honeywell*, 452 F.3d at 1318 (concluding invention was limited to fuel filter because specification referred to fuel filter as "this invention" and "the present invention").  The '445 patent's specification explains why using the cache memory strictly for this purpose is important.  In the prior art, RAM size had to "grow accordingly relative to the size of the flash memory provided by the system," because the prior art used a memory map to store the location of data segments in memory.  (Ex. 2, '445 patent at 8:18-26; *see id.* 7:18-67.)  Because the memory

---

[6] Materials cited in a patent constitute intrinsic evidence. *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

map was stored in RAM, the size of the RAM had to increase as the size of the primary memory increased.

In contrast, the alleged invention eliminates the use of memory maps and instead uses logical links stored in the headers to provide "a logical path to the data segments." (*Id.* at 6:18.)  The only way to determine the location of data in the alleged invention of the '445 patent is to traverse the linked list of data segments, one segment at a time.  (Ex. 4, '445 File History, November 10, 1997 Amendment at 6.)  As a result, the alleged invention of the '445 patent implements a cache memory "only as large as a single read/write block of data," (*id.* at 8:12-15), and the patentees made this clear by repeatedly disparaging larger size caches used in the prior art. *See Chicago Bd. Options*, 677 F.3d at 1372 ("[R]epeated derogatory statements about [a particular embodiment] reasonably may be viewed as a disavowal of that subject matter from the scope of the [p]atent's claims.").

Verbatim's proposed construction is consistent with the meaning of "cache memory" in view of the specification.  Verbatim therefore respectfully requests that the Court construe "cache memory" to mean "memory strictly used to temporarily store a block of read/write data."

### E. Terms from Step (c) of Claim 1: Linking a New Data Segment to a Previous Data Segment

#### 1. "previous logical data segment"

| e.Digital's Proposed Construction of "logical data segment"[7] | Verbatim's Proposed Construction |
|---|---|
| "logically related data segment" | "data segment with a header that stores the physical location of the next logical data segment." |

---

[7] Verbatim contends that this term is improperly truncated and to the extent a phrase needs to be construed, it should be the claim term "*previous* logical data segment."  The disputed term appears twice in claim 1 of the '108 patent.  Both times, the claim refers to "the *previous* logical data segment," not just the "logical data segment."  This is because the word "previous" is necessary to provide the context in which the term is used.

Claim 1 refers to linking two data segments, a new data segment and a "previous" data segment.  This linking forms a linked list where data segments are "retrievable in a seemingly contiguous order."  (Ex. 2, '445 patent at 5:8-9.)  Data segments would not appear to be retrievable in a seemingly contiguous order if the new data segment was not linked to the "previous" logical data segment.

Similarly, Verbatim's proposed construction for the term is consistent with the used of linked lists disclosed by the '445 patent.  The '445 patent discloses that when a data segment is written, "a header is placed at the beginning of the segment.  The header indicates which logically related data segment precedes the new data segment.  The header also indicates ***the location of the next logically related and subsequent data segment.***"  (*Id.* at 4:27-31.)   The location of the next logically related data segment is "an absolute physical address in primary memory."  (*Id.* at 4:38-39.)  Headers are required in order for the alleged invention to function.  (*Id.* at 6:3-8.)  Thus, a logical data segment is a "data segment with a header that stores the physical location of the next logical data segment."

e.Digital's proposed construction ignores the importance of the header included in each data segment.  During prosecution, the applicant explained that "the only way to determine the location of data is to traverse the linked list of data segments."  (Ex. 4, '445 File History, November 10, 1997 Amendment at 6.)  Without the header indicating the location of the next logically related data segment, the linked list would fail.  Thus, e.Digital's construction cannot be correct.

### 2. "a logical link between the previous logical data segment and the new data segment"

| e.Digital's Proposed Construction | Verbatim's Proposed Construction |
|---|---|
| "logically related data segment" | "a pointer written to the previous logical data segment that points to the physical location of the new data segment" |

Verbatim's proposed construction is consistent with the plain and ordinary meaning of the phrase to one of ordinary skill in the art in view of the

13cv2943

specification,[8] and is supported by the intrinsic record.

The '445 patent's specification supports this construction.  For example, it equates a "logical link" to a pointer to the physical location of a data segment by stating that "a path for sequentially accessing the data segments"—which, according to Claim 1, is provided by "logical link[s]" between data segments—is provided by "***pointers to absolute physical locations within flash memory***." (Ex. 2, '445 patent at 6:17-18.)  The '445 patent's specification further discloses that the claimed invention requires the use of pointers to the physical location of data segments to provide logical linkage:

> [I]mplementation of the flash file system ***requires*** that each data segment have written to it a header. Within the header in predetermined fields, ***absolute physical addresses are saved***. These addresses are ***physical locations within flash memory of the next logical data segment***.
> . . .
> [T]he headers of the present invention are written so as to contain ***pointers which point to files*** which a user deems to be logically related to by subject.

(*Id.* at 6:3-8, 17:49-51.)  The patentees also made clear that in a write operation (*i.e.*, writing a data segment to non-volatile memory), a logical link pointing to the subsequent data segment is created:

> In a write operation of a new data segment, a header is placed at the beginning of the segment. . . . ***The header also indicates the location of the next logically related and subsequent data segment.***

(*Id.* at 4:27-31.)

Importantly, neither the '445 patent nor the '108 patent discloses any mechanism for providing a logical link between two data segments other than through a pointer to the physical location from one of the data segments to the other (*i.e.*, a linked list of data segments).  Indeed, the patentees explicitly stated in the

---

[8] Pointers were well-known in the art in the mid-1990s as variables containing memory locations or addresses.  (*See, e.g.*, Ex. 8 ("pointer. . . [A] variable that contains the memory location (address) of some data . . . .").)

13cv2943

'445 patent file history that "the **only way** to determine the location of data is to traverse the linked list of data segments." (Ex. 4, '445 File History, November 10, 1997 Amendment at 5.) Thus, Verbatim's proposed construction is correct.

### 3. "a path for sequentially accessing the data segments within the primary memory"

| e.Digital's Proposed Construction | Verbatim's Proposed Construction |
|---|---|
| "logically related data segment" | "a linked list used instead of a file allocation table (memory map) for sequentially accessing data segments within the primary memory" |

As has been described before, throughout the intrinsic record, the patentees made clear that a linked list of data segments is used **instead of** a FAT (memory map) and indeed enables the **elimination** of a FAT. *See supra* part III.B.2. The patentees thus explained that "logically linked serial data segments" **replace** a memory map, (Ex. 2, '445 patent at 3:47-49), and that the linked list of data segments is the "**only way** to determine the location of data" (Ex. 4, '445 File History, November 10, 1997 Amendment at 5). Because the linked list is the "only" way to determine the location of data, it is clearly used instead of a FAT (memory map).

Furthermore, in computer science and engineering, elements, such as data segments, that are linked together are called a linked list. (*See* Ex. 12, Dictionary of Computing (4th ed.) ("linked list (chained list) A list representation in which items are not necessarily sequential in storage. Access is made possible by the use in every item of a link that contains the address of the next item in the list."); *see also* Ex. 8, Microsoft Press Computer Dictionary (2nd ed.) ("linked list  In programming, a list of nodes or elements of a data structure connected by pointers.").) Indeed, this is how the patentees referred to the path of data segments in the '445 patent file history:

> To increase efficiency, the only way to determine the location of data is to traverse **the _linked list of data segments_**. **The _linked list_ not only**

> *tells where the related data segments are located for one file, but it also links the first data segment of all files together.*
> . . .
> The first file contains an address not only of the next logical data segment, but to the address of the first logical data segment of the second file. Accordingly, *the **linked lists** not only preserve continuity of discontiguous but logically related data segments, they also preserve continuity to previous and subsequent but unrelated files having their own discontiguous but logically related data segments.*

(Ex. 4, '445 File History, November 10, 1997 Amendment at 5-6, 9.)  In other words, the patentees explicitly describe the logically connected data segments as a "linked list" of segments.  Thus, consistent with the plain meaning and the intrinsic record, the path for sequentially accessing the data segments is a linked list.

In light of the above, Verbatim respectfully requests that "a path for sequentially accessing the data segments within the primary memory" be construed as "a linked list used instead of a file allocation table (memory map) for sequentially accessing data segments within the primary memory."

### 4.  "industry standard data storage format"

| e.Digital's Proposed Construction | Verbatim's Proposed Construction |
| --- | --- |
| "industry standard file system" | "format in which data is stored that conforms to an industry standard" |

Verbatim's proposed construction is consistent with the plain and ordinary meaning of the phrase to one of ordinary skill in the art in view of the '108 patent's specification.  By way of example, the '108 patent discusses industry standard formats for recording or storing data in flash memory.  (*See, e.g.*, Ex. 1, '108 patent at Abstract ("a flash memory module which can record data according to industry standard formats"); *id.* at 3:19-21 ("Another object is to enable the flash memory to store data so as to appear readable to industry standard information storage and retrieval operating interfaces and operating systems.").)  The disclosure specifically points to MPEG-2, an industry standard format for storing audio and/or video information.  (*Id.* at 10:53-56 ("The compression algorithm implemented in the present invention can vary as necessary and as technology changes.  However,

industry standards such as MPEG-2 can presently be utilized.").)  Thus, the proper construction for this term, in light of the specification, is "format in which data is stored that conforms to an industry standard."[9]

## V.    Conclusion

For the reasons discussed above, Verbatim respectfully requests that the Court adopt each of the Verbatim's proposed constructions.

Dated: November 17, 2014    **BARNES & THORNBURG LLP**

By:            /s/ Levi W. Heath
Attorneys for Defendant Verbatim Americas LLC
E-Mail: levi.heath@btlaw.com

---

[9] e.Digital contends that the shorter term "data storage format" should be construed. "Data storage format," however, is just a part of the "industry standard data storage format" term for which Verbatim proposes a construction above.  As such, Verbatim contends no construction is necessary for just "data storage format." Should the Court, however, find it appropriate to construe the term, Verbatim proposes that the term should be given its plain and ordinary meaning of "file format in which data is stored."  (Oct. 6, 2014 Joint Claim Construction Statement, App. A, ECF No. 36 at 35-37.)

1

## PROOF OF SERVICE

2    I am a citizen of the United States and employed in Los Angeles County,

3    California. I am over the age of eighteen years and not a party to the within-entitled

4    action. My business address is 2029 Century Park East, Suite 300, Los Angeles,

5    California 90067. On November 17, 2014, I served a copy of the foregoing

6    document(s):

7          **Defendant Verbatim Americas LLC's Opening Claim
           Construction Brief**

8

9    ☒    By CM/ECF: I caused the documents to be electronically filed with
           the Clerk of the Court through the CM/ECF System, and that CM/ECF

10         System will send notice of electronic filing to the parties noted on the
           attached Electronic Mail Notice List.

11

12   I declare that I am employed in the office of a member of the bar of this court

13   at whose direction the service was made.

14   Executed on November 17, 2014, at Los Angeles, California.

15

16

17                                                David B. Kirvan

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:13-cv-02943-H-BLM e.Digital Corporation v. Verbatim America, LLC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Pamela Chalk**
  pchalk@handal-law.com,alodhi@handal-law.com

- **Anton N Handal**
  anh@handal-law.com,alodhi@handal-law.com

- **Levi William Heath**
  levi.heath@btlaw.com,david.kirvan@btlaw.com

- **Gabriel G. Hedrick**
  ghedrick@handal-law.com,alodhi@handal-law.com

- **Chad S.C. Stover**
  chad.stover@btlaw.com,pgroff@btlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)